IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21-26-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| ROY "DOC" ROSALES, | |
| Defendant. | |

Before the Court is Defendant Roy Rosales' Motion *in Limine* and Motion to Suppress, filed January 7, 2022. (Docs. 25, 26). Plaintiff United States of America responded to the Motion *in Limine* on January 21, 2022, and the Motion to Suppress on January 28, 2022. (Docs. 31, 34). The Court held a hearing on the matter on March 4, 2022. The Motion is deemed fully briefed and ripe for adjudication.

Rosales seeks to suppress evidence obtained during a search of his vehicle to which he initially consented, but later revoked the consent. For the following reasons, the Court denies Defendant's Motion to Suppress and reserves ruling on the Motion *in Limine*.

**I.     RELEVANT BACKGROUND**

1

On September 23, 2020, Montana Highway Patrol Trooper Cody Smith pulled over a black Mercedes sedan for driving without a front license plate at 9:45 a.m. on Interstate 94. Trooper Smith approached the vehicle and informed the driver, Roy Rosales, that the trooper pulled him over for driving without a front license plate. Rosales, a female passenger, and a dog were the only occupants of the vehicle. During the initial conversation, Smith noticed a Nevada license plate laying on the front passenger floorboard. Rosales explained that he had been involved in a car accident earlier and that was why the license plate was not attached to the front of the vehicle. Smith also noticed three cellphones in the vehicle and a large, barking dog. To avoid any issues with the dog, Smith asked Rosales to accompany him back to the patrol car.

Once back at the patrol car, Smith checked Rosales' license and registration. The trooper informed Rosales that, so long as there were no other issues, he would give Rosales a warning for the license plate. However, after running Rosales' registration, Smith discovered that the registration was suspended. Rosales told Trooper Smith he had just re-registered the car and Smith called dispatch to check Rosales' new license plate number. While this is happening, Rosales informed Trooper Smith that he was driving from Las Vegas to North Dakota. Rosales was in Las Vegas for his birthday and then drove up to Bozeman to pick up his friend and give her a ride to North Dakota. Rosales told Trooper Smith that his

friend/passenger's name was Kelsey but that he did not know her last name. Rosales said he knew Kelsey for about six or seven months.

Smith then called dispatch to request a criminal background check and discuss the issue of Rosales' suspended registration. Dispatch confirmed that Rosales' registration was also showing as suspended on their system. Rosales told Smith that he could retrieve his car registration from the Mercedes. However, Smith had Rosales stay at the patrol car while the officer proceeded to the Mercedes to check the VIN number and converse with Rosales' passenger. Smith talked to Kelsey (who informed Smith that her last name is Krenowicz) as she looked for the registration paperwork. Kelsey confirmed that she was in Bozeman with Rosales but that she only knew him as "Doc." When Smith asked Kelsey if she knew Rosales' name, Kelsey appeared surprised and asked if something was wrong. Smith asked Kelsey for the registration. Smith then returned to the patrol car.

Once back, Smith again asked Rosales about his registration status. Rosales informed Smith that he re-registered the car from Nevada to North Dakota because Rosales acquired car insurance out of North Dakota. Rosales also informed Smith that his artist nickname is "Doctor R." Smith then called dispatch with Kelsey's information and confirmed Rosales' address.

3

MHP Trooper Troy Muri arrived at the scene at 10:03 a.m. Muri proceeded to approach Kelsey and noticed a strong smell of marijuana coming from the vehicle. Muri asked Kelsey how much weed was in the car and told her that he could smell it. Muri asked Kelsey if she just had a personal use amount of marijuana or if there was more in the vehicle. Kelsey responded that she had a small, personal use amount in a leather bag. Muri then joined Smith and Rosales at the Smith's patrol car. Smith and Rosales continued to discuss the registration issue and Rosales explained that the name on the registration—Rosario Rosales—was his father. Muri asked Rosales how much weed was in the vehicle. Rosales told Muri that he was clean, did not smoke marijuana, and did not smell any marijuana in his car because he drove with the windows down. Smith again contacted dispatch to inquire about the registration issue and dispatch informed Smith that insurance may be the issue.

Smith returned Rosales' drivers license and explained that he was not sure what the issue was with the registration but that he was giving Rosales a warning on the license plate issue and the registration. Rosales thanked Smith, shook his hand, told Smith to have a good day and began to exit the patrol car. Smith told Rosales, "As far as the traffic stop goes, it's over. You understand that?" Rosales replied, "Yeah." (Ex. A at 25:01 to 25:08). Before Rosales could leave the vehicle, Smith asked him if Rosales would mind answering more questions before he left. Rosales said, "Sure, man." (Ex. A at 25:12).

At the same time, Muri returned to the Mercedes and asked Kelsey about the marijuana again. Kelsey showed Muri a container with marijuana. Muri asked how much marijuana was in the container and Kelsey responded with a certain amount. Kelsey told Muri she did not have any other drugs in the car other than the marijuana. Muri explained that, while he did not want to take Kelsey to jail for a personal amount of marijuana, he had to make sure there were not larger amounts in the vehicle.

Back in the patrol car, Smith and Rosales discussed the marijuana and possible other drugs in the vehicle. Rosales told Smith that everything in the car belonged to him other than Kelsey's backpack. Smith asked Rosales for consent to search the vehicle and explained the process for obtaining a search warrant. Muri arrived and informed Smith and Rosales that Kelsey had shown him the marijuana in her container. Rosales told Smith that, "You can search it." Smith and Rosales discussed the issue further and Rosales again responded, "Yeah, search the interior, man." Smith clarified that he wished to search the whole car. Rosales hesitated but again responded, "Yeah, like, go ahead, man." (Ex. A at 29:09 to 29:25).

Smith began searching the vehicle and located a loaded handgun under the driver's seat. Smith also found several extended magazines in the driver's side door panel. When Smith searched the trunk, he found a small "AR" style gun, a shotgun, and more magazines and ammunition. Smith also found a locked duffel bag in the

5

trunk. Muri asked Rosales if the bag was his and if Rosales knew the code to unlock it. Rosales told Muri that he found the bag in Yellowstone along with a bunch of trash. Rosales shrugged when asked if there was anything illegal in the bag. Muri then conducted a pat-down search of Rosales and discovered brass knuckles in Rosales' pocket. Rosales gave a code to the officer to unlock the bag, but the code does not work. At this point, Rosales revoked his consent to search, and the officers stopped their efforts. The officers then impounded the vehicle.

Some time later, DCI Agent Jade Landers applied for a search warrant from the Seventh Judicial District to search Rosales' vehicle for drug paraphernalia, dangerous drugs, weapons, and other property subject to forfeiture. Judge Olivia Rieger signed the search warrant. When law enforcement searched the duffel bag and the trunk, they discovered approximately 263 grams of cocaine and an envelope containing suspected THC concentrate.

## II.  STANDARD OF REVIEW

On a motion to suppress, the Ninth Circuit reviews legal conclusions de novo and factual findings for clear error. *United States v. Basher*, 629 F.3d 1161, 1167 (9th Cir. 2011).

## III.  DISCUSSION

Rosales filed a motion to suppress and a motion *in limine*. The Court shall address the motion to suppress first.

## A. Motion to Suppress

Rosales offers several arguments in his motion to suppress: (1) that investigating officers illegally expanded the scope of the traffic stop into a felony drug interdiction; (2) that Rosales' consent was the result of an initially illegal stop; (3) that the search warrant was not supported by probable cause; (4) that the search warrant lacked particularity and did not authorize a search of the containers in the vehicle; and (5) that any illegal substances or other evidence obtained pursuant to the search warrant are fruit of the poisonous tree and must be suppressed.

The Government responds that the traffic stop concluded once Trooper Smith gave Rosales a warning for the traffic infractions and told Rosales that the traffic stop was over. The Government further contends that Rosales voluntarily consented to answering questions after the conclusion of the traffic stop and initially consented to the search of his vehicle. Alternatively, law enforcement officers had probable cause to prolong the traffic stop and search the vehicle, according to the Government, due to the confirmed presence of marijuana in the vehicle and the search warrant was proper.

Because the Court finds that law enforcement did not improperly prolong the stop and that Rosales consented to further questions and the initial search of his

7

vehicle—a point the defendant does not dispute—the Court will primarily focus its analysis solely on these issues.

### 1. Consent to Search

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for promotion of legitimate governmental interests.'" *U.S. v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Absent a search warrant, a law enforcement search of a person or their property is per se unreasonable subject to only a few, specific exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

One such exception is a search conducted pursuant to consent. *Id.* "A consent to search is valid if the consent was freely and voluntarily given and not the result of duress or coercion, express or implied. *Id.* at 227. Whether consent was voluntary is a question of fact to be determined from the totality of the circumstances. *Id.* The Government has the burden to prove that consent was freely

8

given if that consent is challenged. *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004).

Here, Rosales does not challenge the consent itself. Instead, Rosales asserts that law enforcement illegally prolonged the stop prior to his consent. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

Trooper Smith initiated the traffic stop after noticing that Rosales' vehicle lacked a front license plate in violation of Montana law. Smith then approached Rosales and asked him to accompany him back to the patrol car. Once in the patrol car, Smith ran Rosales' license and registration and the registration returned as invalid. Smith questioned Rosales on the registration for several minutes and continually contacted dispatch to discover the source of the registration issue. Approximately 25 minutes later, Smith gave Rosales warnings for the traffic infraction and registration issue and verbally concluded the traffic stop. (Ex. A at 25:08).

Rosales argues that Smith prolonged the traffic stop further by engaging in a drug investigation. However, it is clear from the video exhibits that Smith

9

concluded the traffic stop once he determined that the registration issue could not be resolved, informed Rosales that the trooper was giving him two warnings and that the traffic stop was concluded. In those 25 minutes between initial law enforcement interaction and the verbal conclusion of the stop, there is no evidence that Smith took any actions besides those necessary to complete the mission of the stop—investigation of the traffic violation. Smith asked Rosales if he understood that the traffic stop was over, and Rosales replied that he did. The officer then asked Rosales if Smith could ask him a few more questions. Rosales agreed to answer more questions and remained in the patrol vehicle. (Ex. A at 25:00 to 25:12). Any further investigation proceeded with Rosales' consent until he revoked that consent and Smith stopped his search of the vehicle. Rosales presents no argument that the consent was not voluntary or otherwise invalid. Therefore, the Court finds that Smith did not improperly prolong the stop, that Rosales consented to answering more questions once the traffic stop concluded, and initially consented to a search of his vehicle.

### 2. Search Warrant Validity

Rosales also argues that the search warrant signed by Judge Reiger lacked probable cause and the requisite specificity. Specifically, Rosales asserts that the search warrant application did not contain a specific drug crime, that the factual

basis to support a search of the vehicle was "slim at best," and that the search warrant did not specify that containers seized from the vehicle could be searched.

"A search warrant is supported by probable cause if the issuing judge finds that, 'given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). To find probable cause, the issuing magistrate must determine "whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. Upon review, this Court looks only to whether the issuing magistrate had a "substantial basis" for determining that probable cause existed. *Id.*

Here, the Court finds that the search warrant application contained sufficient facts for Judge Reiger to conclude a substantial basis for probable cause existed. The search warrant application stated that Trooper Smith had initially pulled Rosales over for a traffic infraction, that an investigation regarding registration issues commenced, and that Trooper Muri detected the smell of marijuana and witnessed a small amount of the substance in the vehicle. (Doc. 26 at 43-45). The application also stated that, after obtaining consent to search the vehicle, officers

11

discovered several firearms, ammunition, cash, and a locked duffle bag. (*Id.*). The Court finds this information sufficient for Judge Reiger to conclude probable cause existed to search the vehicle further.

The Court also finds that the search warrant was sufficiently tailored to the vehicle to be searched and any containers therein. The scope of the search warrant must be limited to "specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). As the Government explained, both the search warrant application and the warrant itself contained provisions related to dangerous drugs and drug paraphernalia that includes containers used for or intended to be used for the storage of dangerous drugs. (Doc. 34 at 27-28); *See also* Mont. Code Ann. § 45-10-101. These provisions clearly allow a law enforcement officer, acting under the power of the search warrant, to search containers in the vehicle suspected of containing dangerous drugs or other contraband. Therefore, the Court finds the search warrant to be valid and sufficiently tailored to the area and items for which probable cause existed to search.

### B. Motion *in Limine*

Rosales also submitted a motion *in limine* seeking to exclude certain testimony of Kelsey Krenowicz as inadmissible hearsay under the Federal Rules of Evidence. These statements relate to her observations and knowledge of

12

Rosales' alleged involvement in drug trafficking. The Government asserts that such a motion is premature and, while the Government intends to appropriately follow the Federal Rules of Evidence, the Government anticipates calling Krenowicz as a witness at trial. Any hearsay issues may be properly dealt with at that time through the objection process, according to the argument.

The Court agrees with the Government's argument. As it is unclear what specific questions the Government intends to ask Krenowicz at this time, the Court cannot properly determine that her testimony would be hearsay or not. The Court will defer its ruling on this issue until proper objections are raised during Krenowicz's testimony at trial.

## IV. CONCLUSION

IT IS HEREBY ORDERED that Defendant Roy Rosales' Motion to Suppress (Doc. 26) is DENIED.

IT IS FURTHER ORDERED that the Court DEFERS RULING on Defendant Roy Rosales' Motion *in Limine* (Doc. 25) until trial.

The Clerk of Court is directed to notify counsel of the making of this Order.

DATED this 12th day of April, 2022.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge